

**SIGNED this 16 day of October, 2008.**

_____

**R. Thomas Stinnett**
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

In re

Maria Esperanza Silvey,
a/k/a Maria Esperanza Duke                          Case No. 06-11860
                                                    Chapter 7

Jerrold D. Farinash, Trustee

      Plaintiff

v.                                                  Adversary Proceeding
                                                    No. 06-1147

Darrel Crow Silvey &
Silvey Sheet Metal Company

      Defendants

**MEMORANDUM**

Appearances: Jerrold D. Farinash & Jason D. Demastus, Kennedy, Koontz & Farinash, Chatta-
nooga, Tennessee, for the Plaintiff

Thomas E. Ray, Samples, Jennings, Ray & Clem, Chattanooga, Tennessee, for
the Defendants

R. Thomas Stinnett, United States Bankruptcy Judge

       The bankrupt debtor, Maria Silvey, was the sole owner of some real property and used it as the site of her business, North River Dance Center. The property was subject to two mortgages, but the debts secured by the mortgages totaled less than the value of the property. In other words, Mrs. Silvey had equity in the property. Within two years before she filed her bankruptcy case, Mrs. Silvey transferred the property to her husband, Darrell Silvey, so that she and Mr. Silvey became owners as tenants by the entirety. The bankruptcy trustee filed this lawsuit against Mr. Silvey and his company primarily to avoid the transfer to Mr. Silvey. The trustee contends that the transfer can be avoided as a fraud on Mrs. Silvey's creditors.

       When Mrs. Silvey became a tenant by the entirety, instead of the sole owner of the property, her unsecured creditors were relegated to asserting a claim against Mrs. Silvey's right of survivorship. Her right of survivorship is the right to full ownership if Mr. Silvey dies before her. *Arango v. Third National Bank (In re Arango)*, 992 F.2d 611 (6th Cir. 1993); *In re Arwood*, 289 B.R. 889 (Bankr. E. D. Tenn. 2003). The amount of the Silveys' equity in the property was a major factor in the value of Mrs. Silvey's right of survivorship, but the right of survivorship would generally be worth much less than the amount of the equity. In summary, when Mrs. Silvey made the transfer to Mr. Silvey to create the tenancy by the entirety, she reduced the value of the real property as an asset her creditors could reach to obtain payment of their claims.

       The trustee alleges that Mrs. Silvey transferred the property to Mr. Silvey with the actual intent to hinder, delay, or defraud her creditors. 11 U.S.C. § 548(a)(1)(A); 11 U.S.C. § 544(b); Tenn. Code Ann. §§ 66-3-101 & 66-3-305(a)(1). In the alternative, the trustee contends that the transfer was a constructive fraud on Mrs. Silvey's creditors because she was insolvent and did not receive reasonably equivalent value from Mr. Silvey in return for the transfer. 11 U.S.C. § 548(a)(1)(B); 11 U.S.C. § 544(b); Tenn. Code Ann. §§ 66-3-305(a)(2) & 66-3-306.

       The facts follow, in more detail.

Mrs. Silvey acquired the real property by purchasing two adjoining tracts. They formed one parcel of property, but the address has been given as 4200 and 4202 North Access Road. The property was subject to two mortgages when Mrs. Silvey made the transfer to Mr. Silvey. One mortgage secured a debt to Suntrust Bank, and the other secured a purchase money debt to the seller, Dixstar, Inc.

Mrs. Silvey owned the property while she was married to Clifford Duke, Jr. While they were still married, she decided that she no longer wanted to operate the dance center, and that decision was one factor leading to their divorce. Mr. Duke either worked for the dance center or was involved in its operation. They signed a marital dissolution agreement in August 2003, but the divorce decree was not entered until a few months later.

Mrs. Silvey, who was still Mrs. Duke at the time, executed a financial statement dated November 30, 2003. The financial statement values the real property at $465,000. She based that estimate on the values of other property in the area. She listed debts of about $137,000 that were secured by the two mortgages on the real property. She also listed about $38,000 in credit card debts. She did not list any debt to her mother.

The state court entered the divorce decree in December 2003. The decree approved and incorporated the marital dissolution agreement that was executed in August 2003. The marital dissolution agreement contains the following provisions:

> Whereas, the parties desire to make arrangement for the settlement of their property rights and other rights and obligations arising out of the marital relationship, and
>
> IT IS, THEREFORE, AGREED
>
> . . .
>
> 3. The daughters of the parties share the use of the 1995 Altima automobile and HUSBAND agrees to maintain insurance on this vehicle for the use and benefit of the daughters.
>
> . . .

5. The WIFE agrees to quitclaim to HUSBAND her interest in real estate located at . . . . HUSBAND shall be responsible for the mortgage owing thereon and shall hold WIFE harmless from any liability thereon.

6. The wife shall retain the real estate already titled in her name and located at 4200 and 4202 North Access Road, in Hamilton County, Tennessee and any interest Husband has or claims in said real estate is hereby divested out of him and vested solely in the Wife. Wife shall be responsible for any mortgage owing on said property and shall hold HUSBAND harmless from any liability thereon.

7. HUSBAND agrees to be responsible for medical insurance for Wife through his employment . . . for a period of one (1) year.

8. The WIFE agrees to pay to HUSBAND the sum of $218.00 per month for a period of six (6) years with no interest on a loan of $58,000 with the exception of $20,000 which represents payments for the minor children in the amount of $10,000 per child.

9. The WIFE shall have the 1991 Nissan Stanza and shall be responsible for any balance owing thereon and HUSBAND shall have the 2001 Ford Taurus and WIFE shall pay any balance owing thereon and each party agrees to hold the other party harmless from any liability.

10. WIFE shall be responsible for payment of the amount of $17,000 as her part of balance due on the Discover Card, and all of the current balances owing to FNANB, Citibank, and J. C. Penney's and will hold HUSBAND harmless for any liability thereon.

. . .

Paragraph 6 of the marital dissolution agreement continued Mrs. Silvey's sole ownership of the real property and required her to pay the mortgage debts.

Paragraph 8 required Mrs. Silvey to pay $218 per month for six years on a $58,000 debt to Mr. Duke. The 72 monthly payments would total $15,696. The wording of the paragraph after this requirement is confusing, but Mrs. Silvey and Mr. Duke agreed on the basic meaning of the paragraph. It required Mrs. Silvey to pay $15,696 at the rate of $218 per month for six years and an additional $20,000 – $10,000 for each of their two daughters. The paragraph stated the debt to be $58,000 but only required Mrs. Silvey to pay $35,696.

Mrs. Silvey and Mr. Duke disagreed on how she was supposed to pay the $10,000 for each daughter. Mr. Duke stated that Mrs. Silvey owes the money to him. Mr. Duke's proof of claim includes the $20,000. Mrs. Silvey stated that she was not required to pay the money to Mr. Duke and she could pay it directly to the daughters' schools. She testified that they were not in school because the schools had not been paid.

Paragraph 10 required Mrs. Silvey to pay $17,000 as her part of the debt on the Discover Card. Mr. Duke was also liable on the Discover account, but this provision was intended to require Mrs. Silvey to pay the full amount owed to Discover so that Mr. Duke would not be required to pay any of it.

In summary, the divorce decree and marital dissolution agreement required Mrs. Silvey to pay:

(1) the mortgage debts secured by the real property;

(2) the debt secured by the Nissan automobile retained by Mrs. Silvey;

(3) the debt secured by the Ford Taurus retained by Mr. Duke;

(4) the $17,000 due on the Discover Card account;

(5) the amounts due on her other credit card accounts with FNANB, Citibank, and J. C. Penney;

(6) $218 per month for 72 months on the loan debt to Mr. Duke;

(7) $10,000 each for the benefit of their two daughters, which would be counted as payments on the loan debt.

In January 2004 Mrs. Silvey began making the payments required by the marital dissolution agreement. She also borrowed $45,000 from David Brock. She testified that she used the money to pay debts. The promissory note to Mr. Brock provided for 6% interest. It did not require installment payments. The principal and interest were due in full in January 2006.

Mrs. Silvey married Mr. Silvey in April 2004. She signed a pre-nuptial agreement with Mr. Silvey. Mr. Silvey testified that his prior divorce cost him more than $1,000,000. Mrs. Silvey's explanation was not clear, but apparently she signed the prenuptial agreement to relieve some of Mr. Silvey's worries.

In May 2004 Mrs. Silvey failed to make the monthly payment of $218 on the loan debt to Mr. Duke. Mr. Duke contacted or had already contacted attorney Katherine White who had represented him in the divorce case. Attorney White sent a letter to attorney Bert Bates concerning Mrs. Silvey's failure to pay debts under the divorce decree. The letter is dated May 19, 2004.

Attorney Bates had a limited role in representing Mrs. Silvey in the divorce case, and the divorce decree relieved him of continued representation, but he apparently passed the letter on to Mrs. Silvey.

The third paragraph of the letter deals with Mrs. Silvey's payment of the $10,000 for the benefit of each daughter:

> Lastly, your client has been unilaterally incurring expenses for the children then informing my client she is deducting same from what she owes him pursuant to the MDA. My client does not agree to these deductions and for future reference, your client needs to get Mr. Duke's approval before incurring additional expenses.

The heart of the letter is paragraph 2:

> Please also be advised that your client was ordered to pay a $17,000 debt to Discover card and the current balances owed to the other credit card companies as set forth in paragraph 10 of the Marital Dissolution Agreement. However, my client is now being hounded by these creditors because of your client's failure to pay same. We would suggest that she get a line of credit against the building that she owns and pay these debts off. This would allow her to get a lower interest rate and avoid penalties. Please see that this gets taken care of immediately. We will expect the payments to be made current until such time as your client makes other arrangements to pay these bills off. If my client continues to be hounded by the creditors for failure to pay on the part of your client, we will have no choice, but to bring an action against your client to address same before the court at which time we will not only seek a judgment against her for the delinquent payments but also

request attorney fees and child support because of the fact that my client's available
resources have been consumed to pay your client's debts.

Mr. Duke testified that he was liable on the credit card debt to Discover but was not liable on the
other credit card debts dealt with by paragraph 10 of the marital dissolution agreement or
mentioned in the letter from attorney White. Discover was hounding Mr. Duke for payment by calling
about every other day. Despite the wording of the letter, Mr. Duke was not being hounded by the
other credit card companies.

In summary, the letter deals with two problems: (1) accounting for Mrs. Silvey's
payments on behalf of the daughters; (2) Mrs. Silvey's failure to make payments to Discover. The
letter states no complaint about Mrs. Silvey's payments on other debts that she was required to pay
under the marital dissolution agreement, such as the monthly payments on the loan debt to Mr.
Duke.

After their marriage in April 2004, Mrs. Silvey and Mr. Silvey began discussing ways
to solve her financial problems. Mr. and Mrs. Silvey both thought that their discussions occurred
in the summer of 2004. The trustee asked both Mrs. Silvey and Mr. Silvey if they discussed
bankruptcy in 2004. Some prior statements suggested that they discussed bankruptcy in 2004. Mrs.
Silvey testified that she did not remember discussing bankruptcy in 2004. She and Mr. Silvey were
focused on using the real property to obtain money to pay her debts. Mrs. Silvey testified that she
wanted to carry out the suggestion made by Mr. Duke's lawyer; she wanted to refinance the debts
on the real property to obtain additional money to pay other debts, especially the debt to Discover
that was also owed by Mr. Duke.

Mr. Silvey agreed that their discussions in the summer of 2004 focused on using the
real property to obtain a loan to pay Mrs. Silvey's debts. He testified that they discussed allowing
foreclosure, but he was against it because he thought there was equity in the property, and
foreclosure would have resulted in Mrs. Silvey's bankruptcy. Mr. Silvey also testified that he thinks

bankruptcy should generally be avoided. He dislikes bankruptcy because Silvey Sheet Metal has been a creditor in bankruptcy cases. He never wanted Mrs. Silvey to file bankruptcy even when she eventually filed in 2006.

Mrs. Silvey testified that her financial problems prevented her from getting a loan to pay her debts, but she thought Mr. Silvey could borrow the money with the property as collateral, and then they could sell the property to pay off Mr. Silvey's loan debt.

In June 2004 Geraldine Kocher of Dixstar, Inc., sent a letter to Mrs. Silvey's business, North River Dance Studio, regarding payments on the debt to Dixstar that was secured by the real property. The letter states:

> I have one check left and that is for June. I think this arrangement has worked out well for both you and me. I would appreciate it if you could send me an additional six checks predated for the next six months.
>
> Also, your checks have been for $550.00 and the payment is only $522.29. I have applied the extra amount to the principal and therefore as of May 2004 the balance is $38,867.81.

In July 2004 Mr. Silvey wrote a $2,000 check to Mrs. Silvey with the notation that is was for two buildings and two car payments. He wrote her another check for $2,000 in August 2004 with the notation that it was for mortgage and credit card debts for August 2004.

Mrs. Silvey responded to the letter from Dixstar, Inc., on August 2, 2004. This was the same day that she contacted Pioneer Title about changing the ownership of the property. Mrs. Silvey's letter to Dixstar states:

> Sorry it has taken me so long to respond. I have been negotiating a sale of the business, not the property. But it has fallen through.
>
> I am enclosing 2 checks for July & August. I am hoping to refinance by Sept. In which case, I will pay the remaining balance.
>
> I am still entertaining thought of purchasing the other building if you are still interested in selling.

I have just recently gotten married. That is why if you tried, you have not been able to reach me. . . .

. . .

P. S. Thank you for letting me send checks this way. It has also worked very well for me.

Mrs. Silvey explained that she made monthly payments to Dixstar, Inc., by giving it six post-dated checks for future payments. In response to the trustee's questions, Mrs. Silvey could not explain how she hoped to pay for the other property owned by Dixstar when she was already deeply in debt, and the business was not doing well. She said that she had attempted to sell the business and thought she had a buyer, but the deal fell through. Furthermore, she had expressed an interest in the property long before the letter and was still interested in it.

Attorney Bill Jones of Pioneer Title Agency testified about execution of the deed to Mr. Silvey that made the Silveys owners of the real property as tenants by the entirety. His records indicated that Mrs. Silvey called on August 2, 2004 about changing her name on the deed to Maria Silvey and adding her new husband, Mr. Silvey. Someone at Pioneer Title routinely asks the spouse who proposes this kind of transfer if he or she wants a tenancy by the entirety or a tenancy in common. In 99% of the transactions, the spouse making the transfer wants a tenancy by the entirety, but the agency checks to confirm that intent. Mr. Jones or someone in the agency explains the survivorship aspect of a tenancy by the entirety but not the effect on creditors of the spouse who will make the transfer. Attorney Jones prepared the deed to Mr. Silvey to make the Silveys owners of the property as tenants by the entirety. Pioneer Title Agency recorded the deed on August 12, 2004.

Mrs. Silvey explained that she made the transfer on her own. She thought that having an interest in the property would give Mr. Silvey peace of mind. She thought that Mr. Silvey would be less worried about obtaining a loan secured by the property if he had an interest in the

property. She told Mr. Silvey about the transfer after it was recorded, probably in August or September 2004 when she received in the mail a copy of the recorded deed.

Mr. Silvey agreed that he did not learn of the transfer until after it was done. He was not certain exactly when he learned of the transfer but thought he must have known about it when he obtained the loan from AmSouth Bank with the property as collateral. That occurred on September 1, 2004. As a co-owner of the property, Mr. Silvey was required to sign the deed of trust. Mr. Silvey's testimony revealed him to be an astute businessman. The court doubts that he would have missed or misunderstood the exact reason for being required to sign the deed of trust. Mr. Silvey testified that being a co-owner of the property did give him additional peace of mind. His testimony was unclear, but he seemed to be saying that the transfer was more important to him as proof of Mrs. Silvey's confidence or trust than as an increase in his assets.

Mrs. Silvey testified that she did not make the transfer in response to the letter from Mr. Duke's lawyer. She was not trying to keep Mr. Duke from getting the property; she was trying to use the property to pay debts, especially the debt to Discover so that Mr. Duke would not be bothered. She was trying to accomplish what Mr. Duke's lawyer suggested in the May letter.

On September 1, 2004, Silvey Sheet Metal executed a promissory note to Amsouth Bank for a loan of $250,000. Mr. Silvey signed the note for Silvey Sheet Metal. Mr. Silvey testified that he guaranteed payment of the note. Mrs. Silvey, however, did not sign a note or any other agreement making her liable to AmSouth for repayment of the loan. She and Mr. Silvey executed the deed of trust (mortgage) to make the real property secure the debt to AmSouth. The promissory note provides for 5.5% interest and 119 monthly payments of $2,042.71 each.

The $250,000 loan was within the line of credit that AmSouth provided to Silvey Sheet Metal and Mr. Silvey. Mr. Silvey could not recall exactly when he applied for the loan. He stated that he keeps his "financials" up to date. He may have already applied for the loan in early August 2004 before Mrs. Silvey executed the deed to make him a tenant by the entirety. Jeff Carter

was the loan officer at AmSouth Bank who was responsible for the account of Silvey Sheet Metal
and Mr. Silvey. He viewed Silvey Sheet Metal and Mr. Silvey as one and the same.  Mr. Carter
testified that Mr. Silvey probably could have obtained the loan within two weeks after he applied.

After the loan AmSouth Bank became Regions Bank, but for convenience the court
will continue to refer to the bank as AmSouth.

The proceeds of the loan from AmSouth were used first to pay the two mortgage
debts secured by the real property. The payoff amounts totaled $131,971.10. Another $2,109.20
was paid to AmSouth for various fees. The balance of $115,919.70 was paid to Mr. Silvey. Mr.
Silvey endorsed the check, and Mrs. Silvey deposited it in the dance studio's account. AmSouth
credited it to the studio's account on September 7, 2004.

On September 13, 2004, someone recorded another deed of the property from Mrs.
Silvey to Mr. Silvey. The wording is the same as the deed prepared and recorded by Pioneer Title
Agency. It includes the printed notation that it was prepared by attorney William David Jones of
Pioneer Title Agency, but neither Mr. Jones nor anyone else in the agency recorded this deed.
Neither Mrs. Silvey nor Mr. Silvey had any idea why this deed was recorded or who recorded it.
Questioning by Mr. Silvey's attorney suggested that it may have been recorded by another title
company that did work in connection with the loan.

Mrs. Silvey used the loan proceeds to pay the loan debt to David Brock.  The check
is dated September 15, 2004. The balance including interest was $46,800.00. The note did not
come due until January 2006. Mr. and Mrs. Silvey had essentially the same explanation for paying
this debt early. Mr. Silvey thought that the money from the loan should be used to pay the most
expensive debts first. When asked how she decided which debts to pay, Mrs. Silvey stated that she
paid this debt because it was interest bearing, and she paid the debt to Discover because Mr.
Duke's lawyer demanded it. Of course, the debt to Discover would have been an interest bearing
debt also.

Mrs. Silvey did not use the loan proceeds to pay other debts owed to Mr. Duke under the marital dissolution agreement. She did not finish paying the loan debt that was to be paid at the rate of $218 monthly for six years. Of course, that was a fixed amount without interest, and it was to be paid in relatively small monthly payments over a long period of time. She testified that Mr. Silvey just wanted her out of debt and did not care whether she used the loan proceeds to pay the other debts to Mr. Duke. Mr. Silvey testified that he was not familiar with the debts to Mr. Duke at that time and didn't care if she paid them, but he thought she should pay the most expensive debts first.

After paying the debts to Discover and Mr. Brock, the debtor would have had about $51,000 left from the loan. The trustee did not rely on Mrs. Silvey's particular uses of this money to prove intent to hinder, delay, or defraud creditors. The exhibits reveal that Mrs. Silvey used most of the money to pay debts, including business debts or expenses and some of her credit card debts. Some of Mrs. Silvey's spending appears to have been for the benefit of her daughters. She also made a $5,000 payment to her mother.

Mrs. Silvey testified that she intended to pay Mr. Duke from the income of the dance center or from other employment. Though she was no longer interested in running the business, she intended to operate it until she could find other employment. Her career in dance did not make it easy for her to find other employment. Mrs. Silvey made three monthly payments on the loan debt to AmSouth in the fall of 2004, but the money for one payment or more may have come from the loan itself.

The bankruptcy trustee asked how she expected to pay Mr. Duke from the business income when the business was losing money. She did not give a detailed answer. Mr. Silvey testified that when he and Mrs. Silvey were considering her financial problems in the spring and summer of 2004, he looked at the finances of the dance center. He thought the business was hurt by the departure of Mr. Duke and was not being run well by Mrs. Silvey. He believed the business

could not continue to operate and pay Mrs. Silvey's debts if she continued to run it as before, but he thought the business could continue if she made some changes.

In October 2004 tests revealed that Mrs. Silvey might have thyroid cancer. The testimony was not clear as to when she became ill, but it must have been before the tests revealed the thyroid problem. The problem turned out not to be cancer, but Mrs. Silvey was still ill and decided to close the business at the end of 2004. She closed the business in December 2004. Mrs. Silvey testified that she closed the business due to her health problems, but the business also lost a considerable amount of money in 2004. She did not explain the timing of the losses in 2004.

Mr. Silvey testified that Mrs. Silvey tried to make payments on the AmSouth loan but was unable after she became ill. When she stopped making payments, he made some payments, and then Silvey Sheet Metal began making the payments and has continued to make them.

Mrs. Silvey testified that she continued making payments required by the marital dissolution agreement to or for the benefit of Mr. Duke until October 2004. Mr. Duke testified that she made regular payments on the loan debt and the cars until October 2004. He testified that she did not tell him about her illness when it occurred or that she was planning to close the business. When he talked to her again in January 2005, she did not tell him she had closed the business. Finally, when they talked in February 2005, Mrs. Silvey told him that he should make the car payments, and she could not pay until the real property was sold.

After obtaining the loan from AmSouth, Mr. Silvey took charge of trying to sell the real property to pay off the loan debt. He obtained two appraisals of the real property. The low appraisal was $265,000 as of December 31, 2004. The high appraisal was $295,000 as of April 27, 2005. He treated the property as having a value in the range between the low appraisal and the high appraisal. Mr. Silvey paid $900 for the two appraisals.

Mr. Silvey spent money for work on the property. He paid $4,700 for remodeling the bathrooms. The bill is dated February 23, 2004, and the check is dated March 1, 2004. This work

was done before Mr. Silvey married Mrs. Silvey in late April 2004 and before she made the transfer to Mr. Silvey.

He spent more money on the property after the transfer to him in August 2004 and after the loan from AmSouth in September 2004. He paid $1,546 for cleaning, painting, taking out window unit air conditioners and repairing the holes, roof repair, gutter repair, and other items.

Mr. Silvey also paid for advertising the property for sale. After eliminating duplicates, the exhibits show that he paid $504 to a local newspaper for advertisements in March and April 2005, and he paid $275 to a local business magazine for advertisements in May, June, and July 2005.

While Mr. Silvey was working toward a sale of the property, Mrs. Silvey began a job with AirTran Airways in June 2005. She testified that she still did not have enough money to pay her debts under the marital dissolution agreement. She explained that she was still paying bills for their daughters. In July 2005 Mr. Duke began a proceeding in the state court to hold Mrs. Silvey in contempt for failure to make payments required by the marital dissolution agreement.

In August 2005 Mrs. Silvey and Mr. Silvey sold the real property to Dorothy Davis for $290,000. According to Mr. Silvey, Ms Davis was unable to obtain a loan to pay the full purchase price immediately. They agreed to accept a $20,000 down payment, a promissory note for $270,000, and a mortgage on the property to secure the promissory note. The promissory note was to both Mr. and Mrs. Silvey because they were the joint owners and sellers. Likewise, the deed of trust was to both of them. The Silveys' deed to Ms. Davis and her note and mortgage to the Silveys are dated August 15, 2005. The deed to Ms. Davis was recorded on August 19, 2005.  Mr. Silvey paid attorney Robert Brown $150 for preparing documents for the transaction.

Mr. and Mrs. Silvey did not receive cash from the sale to pay off the mortgage debt to AmSouth, but AmSouth knew of the transaction and did not object since Silvey Sheet Metal and Mr. Silvey would remain liable on the mortgage debt to AmSouth.

The $20,000 down payment was used first to pay taxes on the real property and a closing fee of $250. The remainder, about $10,700.00, was turned over to Mrs. Silvey. She used it to pay bills for herself and to pay expenses for her daughters.

The note from Ms. Davis provided for 7% interest. It required 59 monthly payments of $2,426.84. The remaining balance of the principal and interest were due in a balloon payment in the sixtieth month. The payments from Ms. Davis were $384.13 more than the monthly payments that Silvey Sheet Metal and Mr. Silvey owed to AmSouth on the mortgage debt. Mrs. Silvey expected Mr. Silvey and Silvey Sheet Metal to keep the difference in return for their assistance in obtaining the loan and selling the property. Her testimony was not clear on the point, but she seemed to take the view that she had no claim to the payments from Ms. Davis.

Mr. Silvey and Silvey Sheet Metal called Barry Wild, a local realtor, to testify that a seller who provides financing will usually charge a higher rate of interest to compensate for the added risks that come with financing. He was not qualified to testify that a seller in the Silveys' position, after considering all the relevant factors, would settle on 7% by adding exactly 1.5% to the 5.5% interest being paid on the secured debt to AmSouth. His testimony was more to the effect that the market set the rate at 7%; that is, Mr. Silvey was a private lender; he needed to cover the debt to AmSouth; he was paying 5.5% interest on that debt; by financing the sale to Ms. Davis, he was taking a greater risk than AmSouth had taken; he settled on 7% as the proper interest rate.

In September 2005 Mr. Silvey wrote a check for $2,500 to the attorney representing Mrs. Silvey in the contempt proceeding brought by Mr. Duke. In October 2005 Mr. Silvey wrote a $4,000 check to Mrs. Silvey for school costs for one of her daughters.

Mr. Duke's contempt proceeding against Mrs. Silvey in state court continued into 2006. He testified that her deposition was delayed two times and was finally set for June 20, 2006, but someone called on June 19, 2005 to tell him or his attorney that Mrs. Silvey had filed her bankruptcy case on that day.

The schedules and statements filed by Mrs. Silvey in her bankruptcy case failed to reveal the transfer of the real property to Mr. Silvey, the sale of the real property to Ms. Davis, Mrs. Silvey's continued interest in the real property as a mortgagee, or her interest as a payee of the promissory note from Ms. Davis. Mrs. Silvey testified that she revealed the transfers to her lawyer before filing the bankruptcy case. The schedules and statements also did not reveal Mrs. Silvey's interest in an automobile used by one of her daughters. By signing the bankruptcy petition, the schedules, and the statements, Mrs. Silvey declared under penalty of perjury that the information provided was true and correct.

The "None" boxes were checked for all 18 questions in the statement of financial affairs. The first question in the statement of financial affairs asks for the debtor's income from employment or operation of a business in the preceding two years. In the two years before filing, Mrs. Silvey had operated North River Dance Center. Schedule I also revealed Mrs. Silvey's employment by AirTran Airways beginning about one year before she filed bankruptcy. The means test statement also revealed monthly income. After filing the schedules and statements, Mrs. Silvey also filed a statement of payment advices from June 2005 through June 2006.

Question 18 asked Mrs. Silvey to identify any business, trade or profession that she was involved in during the preceding six years. Mrs. Silvey's exact title or executive  position at North River Dance Center is not in evidence, but her testimony and Mr. Silvey's testimony indicate that she was operating the business after the divorce from Mr. Duke in December 2003 until she closed it in December 2004. That period was within the six year period covered by question 18.

The schedule of unsecured debts includes a debt to Mrs. Silvey's mother for $175,000. She testified that her mother had lent her money from time to time over the years. The schedule also includes an $8,000 debt to friends who had lent her money for the business.

Mrs. Silvey did not recall whether the transfer to Mr. Silvey was discussed at the meeting of creditors. More than a month before she appeared at the meeting, however, the

bankruptcy trustee opposed dismissal of her case on the ground that a preliminary investigation

revealed the failure of the schedules to include significant assets. The trustee filed the complaint

beginning this adversary proceeding on December 13, 2006.

In October 2007 the trustee filed a motion to amend the complaint. He attached the

amended complaint as an exhibit. The motion stated that the debtor, Mrs. Silvey, failed to disclose

another transfer, and it was not dealt with in the complaint. The motion did not identify the

undisclosed transfer, but the amended complaint added an allegation that Mrs. Silvey had

transferred to Mr. Silvey or Silvey Sheet Metal her right to payment under the promissory note from

Ms. Davis, the buyer of the real property.

The amended complaint also made changes to the allegations regarding lease

payments from Clear Channel, which was leasing a portion of the real property. The effect of the

amendment is not relevant to this discussion.

In November 2007 Mr. Silvey decided to commence foreclosure on the ground that

Ms. Davis was regularly making late payments on the promissory note. The payments are due on

the first of each month, but the promissory note allows a grace period of ten days:

> If payment of any installment under this Note is not paid when due and remains
> unpaid for ten (10) days after the due date, the Payee may elect to accelerate this
> Note to maturity whereupon, without further notice, presentation or demand, all of
> the principal and interest shall at once become due and payable.
>
> A late payment fee of ten (10%) percent of any delinquent installment shall be paid
> to Payee to reimburse Payee for the expense of processing a delinquent payment
> received by Payee more than ten days after the due date.
>
> In the event of such default, Maker agrees to pay all costs of collection, including,
> but not limited to, a reasonable attorney's fee and costs of litigation.

Mr. Silvey considered any payment after the first day of the month to be a late

payment, but that view is not correct for the purpose of determining whether a late payment is a

default under the note. A late payment is a default only if it is made after the ten day grace period

ends. The ten day grace period appears to run through the eleventh day of the month, the tenth day *after* the due *date*.

Leda Johnson, the bookkeeper for Silvey Sheet Metal, testified about the timing of payments received from Ms. Davis, as shown in Exhibit 42. Ms. Davis made payments after the grace period in October 2005, February 2006, August 2006, March 2007, April 2007, May 2007, August 2007, September 2007, and October 2007. Ms. Davis tendered the payment for November 2007 after the grace period, but the payment was refused because Mr. Silvey had decided to foreclose. The December payment was also refused.

In early January 2008 the trustee filed a motion for a preliminary injunction to stop the foreclosure. Mr. Silvey or Silvey Sheet Metal accepted the November and December payments in January 2008, and in March 2008 the trustee withdrew the motion for a preliminary injunction. Ms. Johnson testified that since then Ms. Davis has been making her payments regularly on the tenth of the month. Mr. Silvey testified that the attempted foreclosure cost him attorney's fees totaling $2,832.50.

The court granted the trustee's motion to amend the complaint in late October 2007, but the trustee did not file the amended complaint until June 23, 2008, a week before the trial date. Mr. Silvey and Silvey Sheet Metal filed a motion to dismiss the amendment on the ground that it was filed after the statutory deadline and did not relate back to the original complaint. Mr. Silvey and Silvey Sheet Metal filed an answer to the amended complaint two days after filing the motion to dismiss. The court announced at the trial that it would rule on the motion to dismiss after the trial because the relevant facts should come out at trial without regard to whether the court allowed the amendment, and the facts and law might moot the question of whether to allow the amendment.

DISCUSSION

The court begins with the trustee's argument that Mrs. Silvey transferred the property to Mr. Silvey with the actual intent to hinder, delay, or defraud her creditors, especially her ex-husband, Mr. Duke. The series of transactions beginning with the transfer to Mr. Silvey and ending with the sale to Ms. Davis removed the property from Mrs. Silvey's assets and left her with only a much less valuable interest in the note and mortgage given by Ms. Davis. On the other hand, Mrs. Silvey received $270,000 of the property's value as a result of the transactions and used that money to pay debts. The trustee still contends that Mrs. Silvey made the transfer to Mr. Silvey with the intent to hinder, delay or defraud her creditors as a group or Mr. Duke in particular. The trustee relies on numerous suspicious circumstances to support his argument. Mrs. Silvey gives the facts a much different interpretation. The court generally agrees with Mrs. Silvey, as set out in the following discussion.

In the late spring and early summer of 2004, Mrs. Silvey received two letters regarding payment of her debts. One letter was from Mr. Duke's lawyer. It demanded action only with regard to the credit card debt to Discover. The letter suggested that Mrs. Silvey obtain a loan secured by the real property to pay the debt to Discover.

Mrs. Silvey also received a letter from Mrs. Kocher, whose debt was secured by the property. Mrs. Silvey had been giving Mrs. Kocher a number of postdated checks for mortgage payments. Mrs. Kocher would use the checks as the monthly payments came due. The letter only said that Mrs. Kocher was about to run out of postdated checks and needed more. It said nothing about Mrs. Silvey being behind in payments. It was not a threatening collection letter.

The Silveys began or were already discussing methods of dealing with Mrs. Silvey's financial problems. They did not seriously discuss bankruptcy as a suitable method. Mr. Silvey did not want her to file bankruptcy ever, even when she filed about two years later. He wanted her to pay her debts. The mention of bankruptcy and its quick elimination as a respectable course of

action might be called a discussion of bankruptcy, but it still contradicts the trustee's argument. The court will have more to say on this later.

Mr. Silvey thought the real property was worth more than the mortgage debts and could be used to secure a loan to pay Mrs. Silvey's debts, including the debt to Discover. Mr. Silvey expected the loan proceeds would pay all her debts, but at the time he was not that familiar with her debts under the marital dissolution agreement. Mrs. Silvey knew that her financial condition would prevent her from obtaining a loan even with the real property as collateral. She and Mr. Silvey planned on his obtaining the loan with the real property as collateral.

Mr. Silvey did not require Mrs. Silvey to make the transfer to him before he would obtain the loan. He did not even know about the transfer until after it was done. Mrs. Silvey did not make the transfer to Mr. Silvey purely for the financial purpose of giving him an ownership interest in the property that would secure his debt for the proposed loan. She made the transfer for emotional reasons. It was a sign to Mr. Silvey of her openness and trust. No one at the title company explained how the transfer would affect the rights of her creditors. She had no reason to worry about the effect of the transfer on her creditors since the loan obtained by Mr. Silvey would be used to pay her debts, especially the debt to Discover as demanded in the letter from Mr. Duke's lawyer.  When Mrs. Silvey made the transfer to Mr. Silvey, she was thinking only of using the property for the benefit of her creditors. The transfer was recorded almost immediately and became a matter of public record.

Mrs. Silvey replied to the letter from Mrs. Kocher about the time of the transfer to Mr. Silvey. Mrs. Silvey's reply expressed an interest in buying more property from Mrs. Kocher. Mrs. Silvey had been interested in buying the property in the past and only voiced her continuing interest. Mrs. Silvey's statements did not mean she intended to use her assets or income to buy the property even while her creditors were not being paid. Indeed, when Mr. Silvey obtained the $250,000 loan, Mrs. Silvey used the net proceeds to pay debts and did not pursue the purchase

of the property. The letter to Mrs. Kocher only reveals Mrs. Silvey's overly optimistic financial outlook.

  Mrs. Silvey had to know that Mr. Duke would be interested in what she did with the real property or the business, but she delayed telling him about the transfer to Mr. Silvey or the loan secured by the property. She should have expected Mr. Duke to protest the transfer and to demand full payment from the loan ahead of all other creditors. Mrs. Silvey owed many debts other than the debts under the marital dissolution agreement. With the advice of Mr. Silvey, she decided to pay the more expensive debts first. She paid her credit card debts and the interest bearing note to Mr. Brock. This course of action was obviously intended to improve her financial condition in the future by preventing the interest bearing debts from continuing to grow.

  Mrs. Silvey, and probably Mr. Silvey, did not think she needed to use the loan proceeds to pay off all the debts under the marital dissolution agreement. The monthly payments required by the marital dissolution agreement were relatively small. Furthermore, Mrs. Silvey had plans for paying Mr. Duke from other income. She intended to operate the business for a period of time and use the income to pay the debts to Mr. Duke. In this regard, she used some of the loan proceeds to pay debts of the business. Mrs. Silvey also planned to obtain a job so that her income could be used to pay the debts.

  Mrs. Silvey had no real answer to the question of how she expected to pay Mr. Duke from the income of the business while it was losing money. But Mr. Silvey is obviously a thorough business planner, and he thought the dance center could produce income to pay Mrs. Silvey's debts if it was run better than she had been running it. Obviously, Mr. Silvey's ideas didn't work out or never had time to work out. In this regard, Mrs. Silvey's illness in the fall of 2004 convinced her to close the business in December 2004, especially since it had been losing money anyway.

  Mrs. Silvey still intended to get a job to continue making the payments to Mr. Duke, but illness and lack of skills delayed that plan, and when she finally got a job in June 2005, she did

not make enough to help support her daughters and pay Mr. Duke. Finally, Mrs. Silvey's testimony

left the definite impression that her financial planning was overly optimistic and not firmly grounded

in the details of her situation. The facts do not show actual intent to hinder, delay, or defraud Mr.

Duke or creditors in general.

Mrs. Silvey did not immediately tell Mr. Duke of her illness in the fall of 2004 or her

decision to close the business, but after October 2004 she failed to make monthly payments

required by the marital dissolution agreement. She told Mr. Duke in early 2005 that she had closed

the business, and she would not be able to make the car and loan payments until the property was

sold.

In July 2005 Mr. Duke started the contempt, collection action against Mrs. Silvey in

state court. The Silveys also sold the real property in August 2005, but not for cash. Mrs. Silvey

received about $11,000 from the down payment and used it to pay her debts or expenses for her

daughters. She had suggested to Mr. Duke that she would make payments under the marital

dissolution agreement when the property was sold, but she did not use the down payment for major

payments on her obligations under the marital dissolution agreement. Mrs. Silvey had taken a job

as a flight attendant about this time. She explained that even with her earnings from the job, she

simply did not have the money because she was paying expenses for her daughters.

Mrs. Silvey might have used the difference between Ms. Davis's monthly payments

on the purchase money debt and Mr. Silvey's monthly payments to AmSouth. It was about $384

per month. Mrs. Silvey decided or agreed that Mr. Silvey should keep the difference in return for

all his help, but that course of action apparently resulted from Mr. Silvey's being required to finance

the sale. He did in effect finance the sale because AmSouth trusted him to continue paying it. Mrs.

Silvey apparently believed she would receive the remaining equity from the sale when Ms. Davis

made the balloon payment, and she could use that money to pay more of her debts. Again, Mrs.

Silvey's thinking did not amount to actual intent to hinder, delay, or defraud Mr. Duke or any other creditor.

Mr. Duke's contempt action in state court dragged on until June 2006 when Mrs. Silvey filed bankruptcy. She filed bankruptcy on the day before she was finally going to go through with her deposition in the contempt action. The deposition had been postponed more than once, but at least one postponement was for medical reasons.

The bankruptcy trustee seems to be arguing that the Silveys together or Mrs. Silvey by herself carried out a long plan involving bankruptcy as the last step in frustrating her creditors. This argument must be concerned primarily with the treatment of Mr. Duke since Mrs. Silvey used $270,000 derived from the property to pay other creditors during the term of this alleged plan. The trustee's idea must be that the Silveys intended to squeeze the value out of the property and use it to pay off all her debts, except the debts to Mr. Duke, and then to file bankruptcy to defeat Mr. Duke's claims. The theory does not hold up.

The court has already concluded that Mrs. Silvey's plans to pay Mr. Duke were neither a fantasy nor an after-the-fact explanation for intentionally setting out to prevent Mr. Duke from ever being paid.

The long delay before Mrs. Silvey filed bankruptcy also does not agree with the trustee's theory. A much earlier bankruptcy filing would have made more sense, instead of contending with Mr. Duke's contempt action for almost a year before filing bankruptcy.

Likewise, the trustee's theory is not consistent with the delay of 22 months between the transfer to Mr. Silvey and the bankruptcy filing. The timing of the bankruptcy did not give Mrs. Silvey any special advantages. If Mrs. Silvey had delayed her bankruptcy filing for about two months, she would have gained one advantage. The bankruptcy code's fraudulent transfer statute would not have been available to the trustee because it applies to transfers within two years before the bankruptcy . 11 U.S.C. § 548(a)(1)(B). The delay until two years after the transfer would not

have cut off the trustee's claims under Tennessee law. 11 U.S.C. § 544(b); Tenn. Code Ann. §§ 66-3-310(2), 28-2-103 & 28-3-105; *Orlando Residence, Ltd. v. Nashville Lodging Co.*, 104 S.W.3d 848 (Tenn. Ct. App. 2002).

Furthermore, the Silveys would have been taking a great risk by assuming that all the unpaid debts under the marital dissolution agreement could be discharged in bankruptcy. If they made that assumption, then they made a huge mistake by delaying the bankruptcy filing. They waited until after a change in the law made discharge of the debts even more doubtful. An amendment to § 523(a)(15) of the bankruptcy code expanded the category of debts that are excepted from discharge because they arose from a divorce or separation. The amendment took effect on October 17, 2005, but it was enacted six months earlier in April 2005. 11 U.S.C. § 523(a)(15); Pub. L. No. 109-8, 119 Stat. 23 § 215(3)(C) & § 1501 (2005); *Schweitzer v. Schweitzer (In re Schweitzer)*, 370 B.R. 145 (Bankr. S. D. Ohio 2007). The major changes in the bankruptcy law and their effective date in October 2005 were very much in the news after the law was enacted in April 2005, but Mrs. Silvey did not rush to file bankruptcy during the six month delay.

The evidence does not indicate that Mrs. Silvey was trying to hinder, delay or defraud Mr. Duke by delaying the contempt proceeding. She put off the bankruptcy filing until it was obvious she could not deal with the debts under the marital dissolution agreement.

Among the suspicious circumstances cited by the trustee, the most puzzling is Mrs. Silvey's failure to give complete and accurate information in the schedules and statements filed in her bankruptcy case. The schedules and statements failed to reveal the transfer of the real property to Mr. Silvey, the sale of the real property to Ms. Davis, Mrs. Silvey's continued interest in the real property as a mortgagee, or her interest as a payee of the promissory note from Ms. Davis. Mrs. Silvey testified that she revealed the transfers to her lawyer before filing the bankruptcy case. The trustee has not alleged or proved that she resisted giving the information when questioned by him or creditors.

A bankruptcy case generally is not a good vehicle for hiding important financial information. One fact suggests that Mrs. Silvey was not seriously attempting to hide the omitted facts. Mr. Duke was familiar with her ownership of the real property and operation of the business. When she filed her bankruptcy case, Mr. Duke was attempting to enforce the marital dissolution agreement in state court. Still, she listed him as a creditor. She could not seriously have expected him to ignore the schedules and statements and overlook the failure to disclose the business or the real property. Listing Mr. Duke as a creditor was not consistent with an attempt by Mrs. Silvey to hide the omitted information.

The court also notes that the "None" box was checked for every question in the statement of financial affairs. For some questions, that answer contradicted information given by Mrs. Silvey in other documents filed in the bankruptcy case. For example, Mrs. Silvey revealed her employment and earnings in the statement of current income and the means test statement.

Checking the "None" box for every question is possible for some debtors, but in most cases it should immediately raise questions for the debtor's lawyer, and it is likely to stir the bankruptcy trustee's interest in many cases.

Debtors are also apt to sign schedules and statements without a careful review. The wording of the questions can add to this problem. They use unfamiliar or unclear terms that may cause a debtor to wonder what information is required and what can be omitted, and the debtor may rely on her lawyer without asking questions. She listed Mr. Duke as a creditor, and he was bound to bring these transactions to the attention of the bankruptcy trustee. The omissions apparently resulted from Mrs. Silvey's failure to pay close attention and to question her lawyer about the information that should be included. The omissions do not make sense as a step in a plan by Mrs. Silvey to hinder, delay, or defraud Mr. Duke or any other creditor.

Mrs. Silvey could have used the loan proceeds, the down payment from the sale, or the excess part of the monthly payments from Ms. Davis to pay the debts under the marital

dissolution agreement. In the long run, preferring Mr. Duke over other creditors may have been the better approach for Mrs. Silvey – even though other creditors may have viewed it as evidence of actual intent to hinder, delay, or defraud them. Mrs. Silvey's plans to pay Mr. Duke from future income did not work out. Her plans were overly optimistic and illness interfered. Being overly optimistic, to the point of being unreasonably optimistic, does not equal actual intent to hinder, delay, or defraud creditors. *In re Augie/Restivo Baking Co.*, 87 B.R. 242 (Bankr. E. D. N. Y. 1988).

In summary, the court agrees with the defendants. When Mrs. Silvey made the transfer to Mr. Silvey, she did not intend to hinder, delay, or defraud her creditors or Mr. Duke in particular. Likewise, her use of the money obtained from the property does not indicate the intent to hinder, delay, or defraud creditors in general or Mr. Duke in particular. The suspicious circumstances cited by the trustee were marginally suspicious or have been explained away or do not make sense as part of a plan to hinder, delay, or defraud creditors generally or Mr. Duke in particular.

Was the transfer to Mr. Silvey a constructive fraud on Mrs. Silvey's creditors?

The transfer was constructively fraudulent if Mrs. Silvey was insolvent at the time of the transfer and did not receive reasonably equivalent value in return for the transfer. 11 U.S.C. § 548(a)(1)(B); 11 U.S.C. § 544(b) & Tenn. Code Ann. §§ 66-6-305(a)(2) & 66-3-306. Mrs. Silvey was insolvent at the time of the transfer or was rendered insolvent by the transfer. She apparently does not deny her insolvency, and the evidence supports the conclusion that she was insolvent. The equity in the real property was her sole asset with any significant value to her creditors. For the purpose of argument, the court can assume it was about $156,000 at most. That is the difference between the mortgage debts to Suntrust and Dixstar that were paid with the $250,000 loan and the sale price of the property a year after the transfer to Mr. Silvey. Mrs. Silvey's other debts

substantially exceeded that amount, and she had no other assets with enough value to make up the difference.

The trustee argued at the trial that the Silveys' testimony was a late and blatant attempt to prove the transfer to Mr. Silvey was made in exchange for the $250,000 loan. Proving an exchange would limit the trustee's recovery on the ground of constructive fraud. 11 U.S.C. § 550(e)(2); Tenn. Code Ann. § 66-3-309(d), (f). The trustee's argument had another point; he was attempting to show that the Silveys should not be trusted because they changed their explanations during the bankruptcy case to make them better defenses to the trustee's complaint.

The court disagrees. The Silveys' testimony was aimed at disproving actual intent to hinder, delay, or defraud any creditor. As an obvious side effect,  their testimony clearly proved that the transfer and the loan were not an exchange. Mrs. Silvey did not receive the $250,000 loan proceeds in exchange for the transfer to Mr. Silvey. The Silveys gave up the exchange defense in order to disprove actual intent.

The transfer to Mr. Silvey to create the tenancy by the entirety was a constructive fraud on Mrs. Silvey's  creditors. This leaves the question of whether the court should avoid the transfer or enter a judgment for damages. Neither Mrs. Silvey nor Mr. Silvey intended to harm her creditors. Indeed, the property transactions produced $270,000 that Mrs. Silvey used mostly to pay her debts and expenses for her daughters. The court does not see how avoiding the transfer will produce a significant gain for the bankruptcy estate compared to an award of damages. Furthermore, the court or the trustee can make the award of damages a lien on the real property if needed. The court turns to the question of how to calculate damages if the transfer to Mr. Silvey will not be disturbed.

The briefs and some exhibits submitted by the parties deal with the calculation of damages. The court has a different approach in mind. Suppose that Mr. and Mrs. Silvey are allowed to retain the promissory note and mortgage from Ms. Davis and receive all the future payments. If

Ms. Davis pays off the note, Mr. Silvey will recover the entire $250,000 plus interest that he borrowed from AmSouth. The $250,000 represents Mrs. Silvey's interest in the property at the time of the transfer to Mr. Silvey, but she has already received it and used it to pay creditors. The Silveys will also receive the additional equity of $20,000 that was included in the $270,000 note from Ms. Davis. Mrs. Silvey's creditors will lose all or a part of this equity unless the loss is paid to the trustee as damages. If that is done, then Mrs. Silvey's creditors will be unharmed.

This approach suits the facts. If Mrs. Silvey had not transferred the property to Mr. Silvey, she would have remained the sole owner and the seller. Mr. Silvey did not request or need the transfer to him. He had good reasons for the actions he took even if Mrs. Silvey had remained the sole owner. He wanted to help his wife with her financial problems, and he needed to sell the property at a good price to pay off his debt to AmSouth.

If Mr. Silvey had not been a co-owner and seller, he might have demanded to be a co-payee of the promissory note from Ms. Davis. The same thing could have been accomplished by Mrs. Silvey's transfer to Mr. Silvey of her rights under the note and mortgage to Mr. Silvey. There was no evidence that Mrs. Silvey assigned to Mr. Silvey her rights in the payments from Ms. Davis. Mrs. Silvey understood that the payments were more than enough to offset Mr. Silvey's payments to AmSouth, but she believed Mr. Silvey should keep the payments in return for his help in obtaining the loan and selling the property. The court has no reason to doubt that this informal arrangement would have occurred even if Mr. Silvey had not been a co-owner, a seller, and a co-payee of the note from Ms. Davis. The facts would have worked out the same way.

This court's approach to calculating damages raises the question of whether Mrs. Silvey and her creditors will lose the entire $20,000 of additional equity or only a part of it. Mr. Silvey argues several reasons for reducing the amount. The court's method of calculating damages allows Mr. Silvey no deduction for payments on the secured debt to AmSouth. Since the Silveys will retain

the promissory note and mortgage from Ms. Davis, their payments to AmSouth are for their own benefit, not the benefit of Mrs. Silvey's creditors.

Mr. Silvey has argued that damages should be reduced by the amount of money he spent to improve the property. The problem with this argument is lack of proof. Improvements to real property may increase its value and sale price, but the increase may not equal the cost of the improvements. 11 U.S.C. § 550(e)(1)(B).

Mr. Silvey can make a similar argument that costs of routine maintenance should be deducted. Property may go down in value when routine maintenance is not done, but market forces may increase the value of property even if routine maintenance is not done or is poorly done. In that situation, the lack of routine maintenance only reduces the increase in value. The evidence does not allow the court to say that the costs of routine maintenance incurred by Mr. Silvey accounted for part of the additional $20,000 from the sale.

Mr. Silvey incurred attorney's fees when he attempted to foreclose the mortgage from Ms. Davis. The mortgage and promissory note executed by Ms. Davis give Mr. Silvey a claim against her for the expenses. He may be able to include them in the secured debt that she owes under the promissory note. In the court's method of calculating damages, the expenses did not necessarily benefit Mrs. Silvey or her creditors and should not be deducted from the amount of damages.

Mr. Silvey has a better argument for deducting costs incurred to sell the property. The proposed deduction is not based on value added to the real property. The theory is that the sale costs would have been incurred by Mrs. Silvey to obtain the same sale price if she had been the sole owner and seller. When property sells for more than the property taxes and secured debts, some costs of sale are usually deducted from the remaining sale proceeds, the cash equity. In particular, the seller's real estate agent will receive a commission from the sale proceeds, and the commission will cover the agent's advertising. An argument can be made that advertising costs are

essentially like routine maintenance or improvements; their value is included in the sale price. The comparison is not convincing. Advertising is done to find a buyer and make a sale at a reasonable price; the cost should have little influence on setting a price at which the property can be sold. The attorney's fee for preparing documents was also a cost of sale since it was needed only because the property was sold. The advertising expenses and the attorney's fee totaled $929. Subtracting that amount from the additional $20,000 makes the unpaid amount $19,071.

Mr. Silvey also spent $900 on appraisals to set a reasonable price for the property. The appraisal fees should also qualify as a sales expense, especially since the property was commercial property. Deducting them leaves a total of $18,171 that Mrs. Silvey did not immediately receive from the sale.

An argument can be made that Mr. Silvey's self interest – his need for a sale at a good price even if he was not an owner – and the court's method of calculating damages justify not allowing a deduction for sale costs. On the other hand, the court is attempting to give Mrs. Silvey's creditors the unpaid benefit of the sale, and the benefit would have been reduced by sale costs in any event.

Mr. Silvey also wants the court to treat the debt from Ms. Davis as bearing a lower interest rate than the 7% set by the note. Mr. Silvey is paying 5.5% on the debt to AmSouth. Mr. Silvey argues that the additional interest is compensation to him for the risk of financing the sale to Ms. Davis. The facts support the conclusion that Mr. Silvey in effect financed the sale to Ms. Davis and set the interest rate at 7% on the basis of his risk. His risk was greater than AmSouth's risk because he was providing seller financing and Ms. Davis was not as good a credit risk as he was. In summary, Mr. Silvey argues that the facts necessarily prove an addition of 1.5% interest for the risk he took in financing the sale to Ms. Davis.

The court need not take up any of the problems with this reasoning. The court has undertaken to calculate damages on the theory that the same events would have taken place even

if Mrs. Silvey had remained the sole owner and seller of the property. This means that Mrs. Silvey would have made the sale to Ms. Davis on the same terms. She would have set the interest rate at 7% based on the risk. Her risk would have included the need to pay Mr. Silvey's mortgage debt to AmSouth. Though she was not personally liable to AmSouth, she would have needed the sale proceeds to assure payment of the debt; otherwise, she would risk losing both the sale proceeds and the property. Under this method of calculating damages, the court should treat Mrs. Silvey and her creditors as entitled to the 7% interest that was charged to Ms. Davis. This result is not unfair to Mr. Silvey since he and Mrs. Silvey will retain the promissory note and mortgage from Ms. Davis.

The parties did not explain how the monthly payments from Ms. Davis were calculated. The amount agrees with amortization of the principal and interest over a period of 15 years even though the note called for a balloon payment at the end of the fifth year. Ms. Davis's monthly payments can be attributed mostly to paying the $250,000 already received by Mrs. Silvey in the loan from AmSouth. A portion of each monthly payment – $163.33 per month – can be attributed to payment of the additional equity of $18,171.00. Obviously, the court is treating the additional equity as amortized in the same manner that the promissory note amortized the entire purchase money debt.

The court's method of calculating damages allows the balance of each monthly payment ($2,263.51) to be retained by the Silveys to retire the debt to AmSouth. The $163.33 per month is not protected from recovery on the theory that the Silveys have some sort of set-off for making payments on the debt to AmSouth. The 33 payments of $163.33 per month through the month of the trial total $5,389.89.

At the end of the month, Ms. Davis owed 26 more monthly payments of $163.33 for a total of $4,246.58. The sixtieth payment was to be a balloon payment of the balance after the last monthly payment ($14,066.68) plus some interest. According to the court's calculator, the payoff amount would be $14,147.20. Thus, the stream of future payments due from Ms. Davis totals

$18,393.78. That is the balloon payment plus the 26 monthly post-trial payments of $163.33 each. The damages at the end of the month of the trial should be the present value of this stream of future payments.

Present value is usually determined by discounting the stream of future payments. What amount of money should the trustee receive immediately to produce an equivalent stream of income over the same period of time? The parties have not proved a discount rate, but the court has calculated one by working backward from the interest rate applied to federal judgments as of the end of the week of the trial, also the end of the month. That interest rate was 2.46%, and the note required 27 more payments (2.25 years with annual compounding). These figures yield a discount rate of almost exactly 5.33%. Using the discount rate to more decimal places, the court comes up with a present value of $17,414.04.

The defendants can argue that the court should use a larger discount rate. The 7% interest rate creates a larger stream of income compared to a lower rate, but the 7% rate was set due to the added risk of seller financing and because Ms. Davis was not a sterling credit risk. The theory is that the likelihood of non-payment and other additional risks make the 7% return misleading. A person would not buy the note and mortgage at a low discount rate based on a much safer investment. The potential buyer would treat the interest rate and the stream of income as smaller when calculating present value. The court is not dealing exactly with the question of how a potential buyer would value the note and mortgage from Ms. Davis. The Silveys took the risk of the seller financing and the court's theory of damages allows them the benefit of the higher interest rate if Ms. Davis pays. The court will not reduce the present value on the theory that Ms. Davis is not likely to complete the payments. Indeed, the evidence does not allow the court to say exactly what the decrease should be. The court might conclude that the market increased the interest rate for Ms. Davis from 5.5% to 7% on the basis of the increased risk. The evidence does not allow the court to say that the same 1.5% difference should be used in calculating present value.

Thus, the damages total $22,803.93. That is the sum of the present value of the future stream of income – $17,414,04 – plus $5,389.89, which is the total of the 33 monthly payments of $163.33 per month up to the time of the trial.

The court's method of calculating damages does not strictly follow the wording of the bankruptcy statute. If that process were carried out correctly, however, it should lead to essentially the same result. The evidence does not allow the court to carry out the statutory calculation. If the parties desire it, they can request it and submit evidence and argument on the point.

The facts and the court's reasoning relieve the court of the need to decide whether the trustee's amended complaint should be allowed. Mrs. Silvey did not make a transfer to Mr. Silvey of her rights under the promissory note and mortgage from Ms. Davis. She simply allowed Mr. Silvey, as a payee of the note, to receive the payments and use them. The relevant transfer was the transfer making Mr. Silvey a tenant by the entirety. It resulted in his being a co-owner of the property, a seller, and a payee of the note.

The evidence presents no grounds for imposing liability on Silvey Sheet Metal. The court will enter a judgment in favor of the trustee and against Darrel Crow Silvey in the amount of $22,803.93.

This memorandum constitutes the court's findings of fact and conclusions of law. Fed. R. Bankr. Proc. 7052.

# # #